And we'll proceed to hear argument in the first case on calendar for this morning, which is 21-55885, Michael Fimbres v. Matthew McVeigh, and we will hear first from Mr. Almazan. Did I pronounce that correct? Correct. All right, you may proceed. Good morning, and may it please the Court, Pablo Almazan for petitioner Michael Fimbres, and I'll aim to reserve three minutes for rebuttal. At the start of the trial, the State's disrespect case had one path to victory. It had to show that Michael Fimbres, a gang member, had felt so genuinely disrespected by Taylor's actions that it compelled him to track Taylor down and shoot him dead in the middle of the street. And to carry its case along this path, the State was relying on a paid confidential informant with significant credibility concerns. To say the least, this would have been a long and arduous path for the State to follow. By the end of trial, however, an alternative and easier path to victory had opened up for the State. Under this path, the State no longer needed to rely on the paid confidential informant, and it no longer needed to show that Fimbres harbored any animosity towards Taylor. Instead, all the State needed to do was emphasize one thing, and that was that a third party had witnessed Taylor's disrespect towards Michael Fimbres. This third party witness mattered because Fimbres' own counsel made the reckless decision to elicit testimony that the gang hierarchy would kill her client if he had failed to respond violently to Taylor's disrespect. In other words, now that Fimbres knew about this looming lethal threat from the gang hierarchy, it no longer mattered whether or not he actually harbored any animosity towards Fimbres. All that mattered was this threat that basically provided an alternative life-or-death motive for him to now act offensively towards the victim. There are three reasons why the California Court of Appeals' opinion unreasonably denied Fimbres' ineffective assistance claim. The first is that it completely ignored counsel's explanation for eliciting the testimony at issue. Instead, it created three post hoc rationalizations for this testimony that found no support in the record. Second, it failed to recognize the harm that this testimony had on Fimbres' case. Instead, it adhered to a bright-line rule that… Can you address specifically the court's rationale that she was maybe not doing… …highly inculpatory circumstantial fact that she had to deal with, and this was an effort to do that? Why is it unreasonable for them to say that that was within the realm of strategy? Sure. So first, I would like to point out that we didn't really have to guess as to what counsel's reason was. She did attempt to provide an explanation to the court when the court interrupted her. You know, where are you going with this line of questioning? Did she, in her closing argument, make any reference to this in terms of flight? When she did, she was…not to this testimony. When she did, she was referring specifically to the testimony from the confidential informant, because that confidential informant was the one who allegedly told Fimbres, hey, the Mexican mafia is looking for you. They believe this was a drive-by. You know, I could help you now escape. But that, again, going back to her reason as to why she elicited this deadly consequence gang testimony, that wasn't the reason. And if we look at her explanation when the court interrupted her, the first thing she said is, look, Your Honor, the state had just put on this confidential informant who stated that my client boasted to him that the shooting was about disrespect. So to me, clearly, her focus was on this alleged admission from her client. And then if we kind of put things in perspective, I think it helps show that that was the reason why. Basically, she wanted to neutralize the CI's testimony. And if we look at the context of the trial first, you know, from opening to closing, counsel's argument was that this shooting was in self-defense. But although she had ample evidence to support that theory, there was one thing that kind of directly contradicted it, and that was the testimony from the CI, who obviously said, you know, your client told me that he admitted the shooting was because of disrespect. So that was her focus, and she could have easily kind of explained away the CI's testimony by just simply pointing to the fact that he had credibility issues and argued to the jury, look, he's lying, you can't believe him. But what she then wanted to do was kind of argue in the alternative, and that's even if you believe that this CI is actually telling the truth, it still doesn't matter because our client's self-defense theory still works. And that's because the reason he lied to him was to basically protect his own life from the deadly consequences from the gang hierarchy. And there's one other point I'd like to make to this, is while the CI was still on the stand, counsel basically had him confirm that Fembris was aware that that CI was connected to the gang hierarchy. So basically what counsel, I think, is pretty clear intended to do, was she wanted to explain to the jury, look, you know, my client is talking to someone that he knows is connected to the gang hierarchy. So basically you have to be very careful. He has to be very careful with his choice of words. If he tells that person that, look, you know, I actually tolerated the disrespect from Mr. Taylor and I only actually shot him because I feared for my life, then in that case he would be viewed as weak or a coward, and then it would open him up for a hit to be murdered from the hierarchy. How much did the state, Mr. Amazon, how much did the state actually rely on that theory? I know you've spoken quite a bit about how his counsel did. Sure. So, and that's where I kind of wanted to make my initial point, is, you know, initially the state's case was relying on this one theory that basically Fembris himself had felt so much, I guess, anger from Taylor's disrespect that it caused him to kind of go after him. Once this gang hierarchy testimony is in play, it kind of provides this alternate path to victory for the state. You know, now they don't have to show that, you know, he's actually motivated by this anger. It's basically just that there was a third witness who looked at it. Do you view the record as the state taking that path and closing? Sure. So, and I think here if we compare the opening statement and the closing argument, it's pretty clear that they go there. So, in the opening statement, they recount the facts, and then at the end all they say is, look, you know, the CI admits or will testify that Fembris admitted to him that the shooting was because of disrespect. Then once we get to the closing, although she does, or the prosecution does still argue that, they then also shift to a different argument, and that's look. And I think the words were, you know, I want you guys to remember one important thing, and that's that Fembris' girlfriend had a front row seat to this disrespect. And then the prosecution goes on to say, if Fembris doesn't take care of that, she's going to have a story to tell. Well, the implication is a story to tell to who? It's the gang hierarchy. Because without that testimony that was elicited by counsel, there's no kind of weight behind that statement, right? Like, you know, what's, okay, someone saw it, who cares? But if someone saw it because now they're going to tell the gang hierarchy what happened and then now his life is in danger, then basically the prosecution at that point is saying, look, he had no choice. He had to go after him. The issue of, because the Court of Appeal made alternative findings that it was within the realm of permissible strategy or reasonable strategy from an ex-ante point of view, even if it didn't play out very well, but also that it was not prejudicial under Strickland. And can you address that? Sure. For the prejudice component of the court's analysis, they basically just adhere to this bright-line rule that just because the testimony at issue was one or two pages, it just can't be harmful to Fembris. I mean, but it's really striking. This trial judge was really on top of this issue. I mean, in a very proactive way, he did not want this trial to get off the track. And it was kind of admirable to see the extent to which he was really interjecting to sort of make sure this stayed on track. And that's why it's so limited because of that. So given that, why isn't it, given that proactive intervention of the court repeatedly to try and minimize, you know, any improper introduction of gang testimony, why is it unreasonable for the California Court of Appeal to have said this ultimately wasn't prejudicial? So, again, I don't think they actually tried to look at the harm. They were relying on the fact that it was so short of the list of testimonials, like one or two pages. But what they failed to consider is, you know, once that testimony comes in, that there's this alternative life or death motive for him to act, but in this instance for him to act offensively to kill Taylor as opposed to defensively in self-defense, like you can't unring that bell. And that's where I think Buck v. Davis is instructive because they recognize that even, you know, deadly toxins could come in small doses. So I think here is also what counsel should have realized, too, is from the numerous warnings she did receive from the court that, you know, alarm bells should have gone off in her head and been like, okay, you know, maybe there is something wrong here. Why is he so concerned about this testimony? Well, that goes to performance, but that prejudice standard under Buck is extraordinarily high to surmount. Well, so I would say it's a reasonable probability of a different outcome, which is less than a preponderance of the evidence. And in this case, I would also like to point to, you know, Fimbres did have a pretty powerful self-defense case. You know, the victim himself was found to be carrying a weapon on his person when he died, which was a switchblade. He was found to have multiple drugs in his system. That kind of corroborated the girlfriend's testimony that he was acting aggressively, threatening, kind of like paranoid towards Fimbres. We also have testimony from a third-party witness who observed Mr. Taylor coming towards Fimbres in their car. She actually, I think, testified that she thought Fimbres was giving him a ride. Like, that's how clearly it was that he was approaching them. And then, you know, if we look at post-shooting, what was Fimbres' reaction? You know, he was essentially breaking down. He was in shock. He was saying, oh, my God, oh, my God, basically in a state of disbelief that this had happened. But did not counsel develop most of that in both trial and closing? So why doesn't that mitigate the prejudice overall? Sure. So here's where I think having the two competing life-or-death motives matter, because there's a tiebreaker. And I would argue that the tiebreaker is the kind of timeline of events here. So we know that the disrespect happened before the shooting, about 10 minutes earlier. So, you know, according to this gang hierarchy rule, basically the moment he gets disrespected in front of someone, now that triggers that life-or-death motive that, okay, now I have to act. So under that kind of theory, now he's going after Taylor. So when he gets to Taylor, even if at that point he genuinely believes that, okay, my life is in danger, I have to shoot him, well, he had already decided before, hey, I have to kill this guy because otherwise the gang hierarchy is going to come after me. So I think that kind of shows the prejudice that even if he had this strong self-defense case, it kind of didn't matter because now this alternative life-or-death motive kind of kicked in first. And I see that I'm at three minutes. So unless the Court has any other questions, I'll reserve the rest for a record. Thank you, Counsel. All right, we'll hear now Mr. Thakor. Did I pronounce that correctly? Thakor, Your Honor. Thakor. All right. Thank you. The H is deceptively silent. Good morning, Your Honors. May it please the Court, Deputy Attorney General Shahzad Thakor, for Respondent. I want to start with the testimony that was elicited, and the Court can find this, I believe, on page 492 of the excerpts of record. The trial counsel in this case elicited testimony about the gang hierarchy, about the gang justice system, and about green lighting on one page of transcript, about six or seven questions. And thereafter, the trial court interrupted her and basically asked for an explanation. She didn't ultimately give a true reason. I think that's the fairest reading of the record. What she said was basically a restatement of two facts that had been elicited in testimony. One, that the prosecution had introduced evidence that her client, Petitioner, had boasted to a confidential informant that he had committed the murder. And second, that, let's see, the... It was another fact, Your Honor, right after that. She didn't actually give an explanation for why she was eliciting the green lighting testimony. So the best way we can interpret why she actually did so is to look at her actions. And as I believe Judge Collins stated, in closing argument, she did ultimately say, she used the phrase green lighting. She said, well, you know, why, to help explain why Petitioner fled and made this plan to flee to Mexico, she stated... And why didn't her eliciting that testimony really have the effect of undoing any self-defense, defense that he had? I mean, that's pretty bizarre testimony, I think, to have elicited. Well, I think, you know, the plain, I think it's quite clear what she intended. I mean, the green lighting, she used that exact phrase in closing argument. So, you know, while it may be unusual, especially with the benefit of... Did she use it in closing argument? She said, she said that the prosecution is going to ask why Petitioner fled to Mexico. She said, well, the reason he fled to, that he was making this plan to flee to Mexico is because the Mexican mafia was interested in him and that they had green lighted him. So basically that he was fearful of... Did she explain why they green lighted him? Just that they were interested in him, Your Honor, not that, not anything further than that. But I think the testimony in particular, the fact that she had created this testimony that, okay, there's this thing called green lighting where the gang hierarchy, the people who are influential in a gang can say, okay, here, this person is green lit. That means they are subject to being killed. So by explaining that concept of green lighting and how the gang hierarchy plays a role in that... Did she point towards any theory as to why he was green lighted? Right. So the jury would have understood why because in the recording of the conversation between Petitioner's girlfriend and the confidential informant, that influential people in the gang hierarchy were looking for Petitioner and that they, quote, wanted to smoke him. So it would have been understood by the jury that because the confidential informant had conveyed to Cordero, Petitioner's girlfriend, who then conveyed to Petitioner, that that's the reason. So there was a reason on the record, Your Honor, why he was green lit. Well, I guess looking at the Court of Appeals decision and focusing on the D2 support in the record here, that's not what the Court of Appeals leads with, and it doesn't... It's hard to read this as the court clearly surmising from the record what you surmise and what you ask us to surmise. So why doesn't that create a problem under D2 as an unreasonable reading of the record? So what's important to understand about this is the scope of the claim on appeal. Right now, Petitioner is challenging the testimony about gang justice system, gang hierarchy, and green lighting as being problematic, that defense counsel shouldn't have elicited that testimony. But on direct appeal, the claim was much broader. The claim was not only that this one page of testimony was problematic, but also that basically anything beyond the topic of disrespect was problematic. Some of the things that defense counsel ultimately elicited beyond the topic of disrespect from the gang expert was that Taylor, the victim, was a member of a different gang, that there was no rivalry between Taylor's gang and Petitioner's gang, that members of different gangs could have social relationships. So I think when we analyze the first two reasons given by the court of appeal, because the third reason is quite clearly the green lighting. Well, part of the first reason, though, seems to misapprehend who introduced the this is the streets type evidence. Those are the concern he had that the victim might have been carrying a gun. They just get that wrong, don't they, in terms of where that testimony comes from? They attribute it to her cross of Morales, and it came from Cordero. So I don't think they're actually saying that this is the streets testimony came from Officer Morales and not Cordero. I think what they're saying is Officer Morales' testimony helped her make that argument in closing. So in closing, she says this. She makes this argument about this is the streets. And so the reason that that's a compelling argument, that that's more persuasive, is because she's elicited testimony that Taylor, the victim, is a gang member. It doesn't hold as much weight to say this is the streets and there's going to be this reaction from Petitioner if Taylor, the victim, is just an ordinary civilian. Now, if he's a gang member, then suddenly this is the streets, this was a reaction. In essence, it creates an impression that Petitioner's belief in the need for self-defense was reasonable. So I agree. I don't think the court is saying that these pieces of testimony, that this is the streets, this is a reaction, was actually from Officer Morales, but that Officer Morales' testimony actually helped in making the self-defense argument. I believe it was Judge Johnstone who mentioned the reliance by the prosecution on this testimony, the alleged second motive that Petitioner was supposedly in fear of retaliation from his own gang. And Petitioner cites to this portion of closing argument by the prosecution where he references this, that Cordero had a front row seat to the disrespect and that she would have a story to tell. That was not testimony elicited by defense counsel. That was testimony elicited by the prosecution. And almost that exact language about Ms. Cordero having a story to tell, it can be found on page 485, and that's during the direct examination of Officer Morales, not on the cross. Could you speak to the prejudice? Yeah, absolutely, Your Honor. And there's actually, the court already sort of touched on the fact that this testimony was rather brief, but I think it's important to also acknowledge the overwhelming evidence that Petitioner premeditated the murder. The day of the shooting, Petitioner told Taylor's girlfriend that he was going to, and pardon my language, Your Honor, quote, fuck up, end quote, Taylor for stealing his drugs. Hours later, Taylor confronted Petitioner in front of Cordero, and he said, quote, and again, pardon my language, fuck your hood, which would have been understood, as Officer Morales testified, as quite a serious insult. And if the court is wondering, well, why didn't he just shoot him right there? In that instance, we have testimony from, or not testimony, but we have a recording in which Cordero told the confidential informant that it was irresponsible for Taylor to show up in the alley behind Petitioner's home because that area was, quote, hot, meaning that it could have been subject to a police raid. So knowing that, Petitioner would not have wanted to shoot him right there. Instead, just a few moments later, Petitioner drove along a route that he knew Taylor would be taking to get to his house, or to get to his tent, because he was someone who was transient. And when he saw Taylor across the street, he parked his truck. One of the things that Petitioner mentions is that he parallel parked. That's completely not true, Your Honor. If the court looks at page, and I want to get the citation right, it's at page 197 to 198. The record shows that he parked parallel to the sidewalk, not that he parallel parked, which is a distinction, Your Honor. We have an uninterested third-party witness who, from her front yard, saw Petitioner get out of his truck. He moved toward the middle of the street as Taylor moved toward the middle of the street, and he lifted his arm. She did not see him reach into his clothing for a moment.
judges: COLLINS, THOMAS, JOHNSTONE